781 So.2d 871 (2001)
STATE of Louisiana, in the Interest of T.D., T.D. and W.D., Plaintiff-Appellee,
v.
R.D. and L.D., Defendants-Appellants.
No. 34,580-JAC.
Court of Appeal of Louisiana, Second Circuit.
March 2, 2001.
*872 W. Allen Haynes, Shreveport, LA, Counsel for Appellant R.D.
Michelle Dufour Brown, Public Defender Board, Counsel for Appellant L.D.
James Chrishon, Department of Social Services, Counsel for Appellee.
Alan Thomas Seabaugh, Shreveport, LA, Counsel for the Children, T.D., T.D. and W.D.
Before NORRIS, GASKINS and CARAWAY, JJ.
GASKINS, J.
The mother of three minor children, L.D., appeals from the juvenile court's termination of her parental rights to the children. The father of one of the children, R.D., appeals from the juvenile court's termination of his parental rights to his child. We affirm the lower court.

FACTS
The children, twins T.D. and T.D. (DOB 9/6/90), and W.D. (DOB 5/27/93), were originally in the custody of their mother, L.D. (The father of the twin boys is deceased, while W.D. is the daughter of R.D., a married man with whom L.D. had a sporadic relationship.) In November 1996, an instanter order was issued to remove the children after the mother, a drug addict, left them alone in an apartment for an extended period of time while she went to a crack house. They were placed in the custody of the Department of Social Services (DSS). In January 1997, the children were adjudicated in need of care.
The original goal of DSS was reunification of the family. Initially, the mother sought treatment for her substance abuse problems and was allowed weekend visitation. However, she relapsed into drug use in mid-1997, and the overnight visits were discontinued. Another factor which contributed to the end of these visits was the discovery of bruises on one of the twins, the result of a beating by the mother's uncle.
In August 1999, the state filed a petition to terminate parental rights in accordance with La. Ch. C. art. 1015(5). The petition alleged that the mother used crack cocaine and had left the children alone on several occasions. It also stated that DSS had had prior contacts with the family in May 1995 for bruises on one of the twins and in *873 April 1996 for lack of supervision and inadequate food. Although DSS repeatedly implemented case plans to reunite the mother with her children, she continued to use drugs and alcohol. As to W.D.'s father, the petition alleged that in May 1998, DSS offered to work with him toward placement of the children with him; however, he made no attempt to work toward this goal. Furthermore, in January 1999, when offered a case plan for placement of W.D. with him, he refused to comply with the case plan.
In April 2000, the mother filed a petition requesting that the court order home studies of two relatives with an eye toward relative placement of the children. However, home studies on maternal relatives were either incomplete due to a lack of cooperation or unfavorable.
In July 2000, the juvenile court heard evidence pertaining to the petition to terminate parental rights. The mother's attempts at drug treatment had been unsuccessful, and she was, by her own admission, still using drugs. W.D.'s father, who was married and had at least three children with his wife, had been uncooperative with DSS. According to the case worker, the father repeatedly refused to sign an acknowledgment of W.D.'s paternity, allow a home study or name relatives with whom W.D. could be placed. The evidence indicated that the self-employed father had been paying the mother's bills, as well as supporting her $100 a day drug habit. However, he did not comply with the case plan requirement that he contribute toward W.D.'s support. Also, the father complained that he did not feel that DSS had worked with him sufficiently, then stated that it was not "his job" to ask them to work with him. Despite three years of college attendance, he asserted that he was unable to understand the case plans he signed with DSS.
The foster mother with whom the children had lived for three years testified that contact with the parents had been somewhat sporadic. Occasionally, the parents, particularly W.D.'s father, had given the children small amounts of money and a few gifts. According to the foster mother, W.D. has attention deficit disorder, which requires medication and periodic doctor appointments. (Reports in the record indicate that the twins also suffer from this disorder.) The foster mother testified that she and her husband, who already have a child of their own, are willing to adopt all three of the children. She testified that the mother had told them at their last visit that they could adopt the children because she no longer had time for them and did not wish to be bothered with the children any more.
The juvenile court granted the state's petition, finding that both parents were "unwilling" and that there had been no substantial compliance with the case plan by either parent. The court also found that there was no reasonable expectation of significant improvement in the parents' behavior in the near future. While noting that DSS was tardy in implementing a case plan for W.D.'s father, the court found that the father had been involved in the litigation for an extended period of time and was aware of his ability to seek custody. Furthermore, the court found that the father had sufficient access to counsel to protect his interest at an early point in the proceedings. To the extent that there was error in not appointing separate counsel for the father at the outset, the court found that the error was harmless. The court ruled that termination was clearly and convincingly in the best interest of the children. It stated that the children were at "the most critical *874 age" when the need for a permanent, safe and stable home was at its highest and that they had such a home available with their foster parents who wished to adopt them.
Both the mother and W.D.'s father appealed.

TERMINATION OF PARENTAL RIGHTS
La. Ch.C. art. 1015 provides in relevant part:
The grounds for termination of parental rights are:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
La. Ch.C. art. 1036 governs proof of parental misconduct. In pertinent part, it states:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend courtapproved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
. . . .
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
In a termination of parental rights case, the state must prove all of the elements of its case by clear and convincing evidence. La. Ch.C. art. 1035. That evidence must allow the conclusion that termination is in the best interest of the children. La. Ch.C. art. 1039; State in Interest of S.C. v. D.N.C., 26,104 (La. *875 App.2d Cir.6/22/94), 639 So.2d 426, writ denied, 94-1977 (La.11/4/94), 644 So.2d 1061.
The trial court's factual determinations in a termination of parental rights case, including whether a parent is unfit and whether there is a reasonable expectation of reformation, will not be set aside in the absence of manifest error. State in Interest of D.T. v. K.T., 29,796 (La.App.2d Cir.6/18/97), 697 So.2d 665.

Mother's rights
As to the mother, review of the record reveals that the state carried its three-prong burden of proof under La. Ch.C. art. 1015(5) by clear and convincing evidence. More than one year had elapsed since the three children were removed from the mother's custody pursuant to a court order. Despite the considerable efforts of DSS to reunite the family, there had been no substantial compliance by the mother with the case plans designed to facilitate the return of the children to her care. She frequently failed to comply with even the most basic DSS requirements, such as keeping the agency informed of her address and phone number. More importantly, she repeatedly failed to successfully complete the drug treatment required under the case plans. Although she initially sought treatment, she essentially discontinued her efforts after her 1997 relapse. Finally, there was no reasonable expectation of significant improvement in the mother's conduct in the near future. At the termination hearing, the mother admitted to recent drug usage and she was unable to give the court assurances that she would refrain from future drug use. She contended that if the court were willing to return the children to her, it would take six months to a year for her to "get her life together" sufficiently.
Based upon the evidence in this record, we find that her estimate was unduly optimistic. The children have been in the care of DSS for more than four years. During that time, the mother has put forth little effort and made virtually no progress against her addiction. As correctly observed by the juvenile court, her children are of crucial ages when they require the safety and stability of a permanent home. Termination of the mother's parental rights is clearly in the best interest of these children.
We cannot say that the juvenile court was manifestly erroneous in finding that termination of the mother's parental rights to her three children was warranted under the facts of this case. The record amply supports the lower court's decision to terminate the mother's rights.

Father's rights
W.D.'s father contends that counsel should have been appointed for him, separate from that for the mother, in the child-in-need-of-care proceedings. He argues that this deficiency should negate the proceedings to terminate his parental rights to W.D.[1]
Under La. Ch.C. art. 608, the parents of a child who is the subject of a child-in-need-of-care proceeding shall be entitled to counsel, which right they may waive. Furthermore, if the parents are financially unable to afford counsel, the court shall appoint counsel or refer the parents for representation by the indigent defender board. As to termination proceedings, La. Ch. C. art. 1016 states that the parent has the right to be represented and, if indigent, *876 counsel shall be appointed for the parent.
The record does not contain the minutes from the child-in-need-of-care proceedings. The juvenile court, however, stated on the record that it had reviewed them and determined that the Indigent Defender Board acted as attorney for both parents at the adjudication and disposition. We are aware of nothing in the record tending to contradict this. Based upon this evidence, the juvenile court found that the father had access to counsel that could have and would have argued for his interests.
As noted by the juvenile court, this case presents an unusual situation. This is not a case where the father tried diligently to work a case plan and was presented with obstacles by DSS or was confronted with a complex case plan that required assistance of counsel to work through the plan. The plan ultimately approved specified only the most basic of legal requirements for him to take custody of the child. He refused to comply with any of these requirements. Due to this refusal by the father, the court found that it was appropriate to use its discretion under La. Ch.C. art. 1015(5) to find that an adequate amount of time had passed to evaluate the father's compliance under the case plan. The juvenile court found by clear and convincing evidence that the conditions of La. Ch.C. art. 1015(5) had been met.
The lower court was correct in its assessments. The record reveals that R.D. was intricately involved with DSS since the children were first removed. It was R.D. who located the mother at a crack house and informed her that the children had been placed in DSS custody. He attended meetings with the mother and DSS personnel concerning the children. Even though married to another woman, he has lived with the mother periodically and was obviously aware of the situation with the children.
To give credence to R.D.'s argument would only cause W.D. to languish unnecessarily in the uncertain limbo of foster care for an indefinite period of time. This seven-year-old girl has already spent more than half of her life in DSS custody. Her father has repeatedly and persistently failed to cooperate with DSS on every aspect of the case plan established for W.D.'s benefit. He refused to do any of the following: submit to a home study and supply pertinent information for a criminal records check; permit interviews of all family members in his home and provide information necessary for criminal inquiry on those persons; sign releases of information required by the agency; begin in-home visits, working towards overnight and weekend visits after completion of the home study with an eye toward full-time placement of the child; and complete an acknowledgment of W.D.'s paternity. His judicial admission of W.D.'s paternity at the termination hearing does nothing to mitigate against his many prior refusals and failures.
The state carried its burden of proving by clear and convincing evidence that R.D.'s parental rights should be terminated and that it is in W.D.'s best interest to be released for adoption by her loving and caring foster parents.

CONCLUSION
The judgment of the juvenile court is affirmed. Costs are assessed to the appellants.
AFFIRMED.
NOTES
[1] In the termination proceedings, W.D.'s father had appointed counsel who represented only the father.